**KASOWITZ LLP**
Daniel A. Saunders (SBN 161051)
DSaunders@kasowitz.com
Matthew S. Manacek (SBN 312834)
MManacek@kasowitz.com
1801 Century Park East, Suite 1830
Los Angeles, California  90067
Telephone:     (424) 288-7900
Facsimile:     (424) 288-7901

Edward E. McNally (*pro hac vice* application forthcoming)
EMcNally@kasowitz.com
Daniel J. Fetterman (*pro hac vice* application forthcoming)
DFetterman@kasowitz.com
1633 Broadway
New York, New York 10019
Telephone:     (212) 506-1715
Facsimile:     (212) 506-1800

*Attorneys for Plaintiff Ford Motor Company*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FORD MOTOR COMPANY, a Delaware Corporation,<br><br>              Plaintiff,<br><br>     v.<br><br>QUILL & ARROW LLP,<br><br>              Defendant. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1.  **VIOLATION OF CAL. PEN. CODE § 496**<br>2.  **VIOLATION OF CAL. BUS. & PROF. CODE § 17200**<br><br>**[Jury Trial Demand]** |

COMPLAINT

Plaintiff Ford Motor Company ("Plaintiff" or "Ford") files this Complaint against defendant Quill & Arrow LLP ("Quill") for damages, equitable, and other relief for Quill's violation of California Penal Code Section 496 and California Business & Professions Code Section 17200.  In support of its claims, Ford alleges as follows:

**<u>INTRODUCTION</u>**

1.      This action arises from a sweeping and systematic scheme by Quill to defraud Ford of tens of millions of dollars through fabricated attorney billing records, unauthorized practice of law, and deliberate obstruction of Ford's ability to fulfill its warranty obligations to its own customers that, among numerous other consequences, damages Ford's relationship with its customers and erodes future sales.

2.      Quill holds itself out as a California law firm specializing in consumer claims under California's Song-Beverly Consumer Warranty Act (the "Lemon Law"), Cal. Civ. Code §§ 1790 et seq.  In truth, Quill is not principally a law firm—it is a fraudulent and illegal billing factory, conceived and constructed to exploit the Lemon Law's fee-shifting provisions by manufacturing tens of thousands of cases and billing Ford and other automakers ("Automakers") at California attorney rates for work performed entirely by non-lawyers earning as little as $13 per hour.  And while Ford considers the California Lemon Law to be the most pro-consumer law in the country, even the generous remedies of the Lemon Law were not enough for Quill, which has chosen to exploit the trust afforded to plaintiffs' lawyers as officers of the court seeking fee-shifting under the Lemon Law to maximize its profits through fraud.  Indeed, from engagement by its clients to final payment by Ford, fraudulent, unlawful, and unfair business practices permeate the entire lifecycle of each of the thousands of Lemon Law claims Quill manufactures each year.

3.      The scheme operates on two interlocking tracks.  On the "front end," Quill systematically corrupts the attorney-client relationship by recruiting Ford vehicle owners through deceptive advertising, coaching them to conceal Quill's involvement, scripting their communications with Ford to avoid triggering Ford's repurchase

2

obligations, instructing them to ignore Ford's repurchase offers, and refusing Ford's requests for information required to calculate a statutory repurchase offer.  These tactics are designed not to advance clients' interests—which would have been served by a prompt, pre-litigation vehicle repurchase—but to manufacture prolonged litigation and exposure to civil penalties from which Quill, not its clients, primarily benefits.  Indeed, in numerous instances, Quill files lawsuits without client knowledge or consent.

4.     On the "back end," Quill fabricates the billing records it submits to Ford and to courts.  Quill's billing department takes time entered by overseas virtual assistants ("VAs")—sometimes referred to by Quill as "bots"—and domestic non-attorney staff for a variety of tasks and reallocates the time for those tasks to licensed California attorneys who never performed the work, billing it at California attorney rates of $350 to $950 per hour.  In place of the actual time sheets in which the work is contemporaneously recorded, Quill submits false billing records to Ford and to federal and state courts, supported by false sworn declarations stating that the billing records are contemporaneous attorney time entries that Quill's Co-Founding Partner has "carefully reviewed and audited."  In fact, the billing records are utter fabrications.

5.     Since January 1, 2021, over thousands of cases, Ford has paid Quill more than $100 million, of which Ford estimates approximately fifty percent—more than $50 million—represents attorney's fees.  Ford reasonably estimates, based on its review of a significant sample of fee applications that Quill has submitted to California courts, that no less than fifty percent of the fees Ford has paid were fraudulently and illegally obtained through Quill's systematic misrepresentation that tasks performed by non-lawyers were performed by California-licensed attorneys.  On June 1, 2026, Ford demanded that Quill return the property that Quill unlawfully obtained from Ford.  Quill has refused to comply with Ford's demand and to date has not repaid Ford.

6.     Ford brings this action to recover the money fraudulently and unlawfully extracted from it, to obtain injunctive relief against Quill's continuing unlawful conduct,

3

COMPLAINT

and to hold accountable those responsible for one of the largest attorney billing fraud schemes in California history.

## PARTIES

### Plaintiff

7.      Plaintiff Ford is an automobile manufacturer incorporated under the laws of the State of Delaware, with its principal place of business in Michigan.

### Defendant

8.      Defendant Quill is a law firm with a principal address of 10880 Wilshire Boulevard, Unit 1600, Los Angeles, California 90024.  Quill is a California limited liability partnership.

## JURISDICTION AND VENUE

9.      This Court has diversity jurisdiction in this matter pursuant to 28 U.S.C. § 1332.  Plaintiff is a Delaware corporation with a principal place of business in Michigan.  Defendant is headquartered in California and its partners are residents of California.  The amount in controversy exceeds $75,000.00.

10.      Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions by Defendant giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

**The Song-Beverly Act and Its Fee-Shifting Provisions**

11.      California's "Lemon Law," the Song-Beverly Consumer Warranty Act, Civil Code §§ 1790 *et seq.,* provides consumers who purchase defective vehicles with the right to a repurchase of their vehicle if the manufacturer fails to conform the vehicle to applicable warranties after a reasonable number of repair attempts.  The statute is designed to incentivize prompt resolution: it provides for recovery of "the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer."  Cal. Civ. Code § 1794(d) (emphasis added).  The statute also permits civil penalties of up to two times

actual damages where a manufacturer willfully fails to comply with its repurchase obligation.  Cal. Civ. Code § 1794(c).

12.     The policy animating the Lemon Law is the prompt, efficient resolution of legitimate warranty disputes in consumers' favor—not the generation of attorney's fees. The fee-shifting provision was intended by the California Legislature as a tool to coerce manufacturers to honor their obligations quickly, not as a mechanism for the mass manufacture of fee income.  The statute's use of the phrase "actual time expended" reflects the Legislature's intent that fee-shifting reward legitimate legal work, not fabricated time records.  The fee applicant has the burden of showing that its requested fees are reasonable by submitting billing records reflecting the actual time spent by identified timekeepers on identified tasks.  Counsel submitting fee applications to courts do so under penalty of perjury and as officers of the court.  The integrity of the fee-shifting system depends entirely on the honesty of those representations.  Alternatively, plaintiff's counsel may submit a fee statement to the auto manufacturer in an effort to resolve a fee claim without involving the court.

**Quill's Business Model**

13.     Quill was founded and structured from its inception not as a conventional law firm but as a mass-litigation-fee-extraction enterprise.  Quill employs a small number of licensed California attorneys relative to the volume of cases it files.  On information and belief, in the last five years Quill has filed more than 20,000 cases under the Song-Beverly Act.  The ratio of cases filed to licensed attorneys at the firm makes it a mathematical impossibility that licensed California attorneys performed more than a small percentage of the legal work billed as attorney time in Quill's fee statements and applications.

14.     Thousands of cases means thousands of complaints, thousands of sets of discovery requests and responses, thousands of initial disclosures, thousands of demand letters, thousands of settlement notices, and thousands of client communications.  Until recently, *none* (or substantially none) of these tasks were performed by Quill's lawyers

5

and were instead performed by Quill's army of non-lawyer VAs located overseas in places such as Mexico and the Philippines (and paid as little as $13/hour), paralegals, legal assistants, and attorney assistants.  Yet Quill fraudulently and in violation of legal and ethical business practices attributes *all* of the time of these non-lawyers to its California attorneys at California attorney rates when presenting demands to Ford.

15.     To make this case-filing and fake-billing factory at Quill work, Quill's billing department—overseen by Quill's Co-Managing (and Co-Founding) Partner Jonathan Shirian—takes the time entered by its non-lawyer staff and VAs, allocates that time to an attorney *who never performed the billed task*, and creates timesheets based on that California attorney's hourly rate, without ever disclosing those facts to Ford, its own clients, or the courts.  If the clients ever saw the billing materials, they might recognize some of the discrepancies in who performed certain tasks (such as an interview with the client). But a firm acting under a contingency agreement has no reason to share that information with its clients, and the clients have no incentive to question inaccurate representations, so there is no check on Quill's behavior.

16.     Quill typically enters into contingency fee agreements with its clients entitling it to as much as 50% of any recovery in excess of actual damages, including civil penalties.  Accordingly, the first prong of Quill's scheme, once it hooks a client, focuses on positioning a case to support civil penalties by instructing its clients not to respond to Ford's communications, to refuse to provide information Ford needs to develop the Lemon Law repurchase amount, and to ignore Ford's repurchase offers. Then later at trial, Quill will argue that Ford failed to repurchase the vehicle and that such failure qualifies the case for civil penalties—from which Quill takes a generous cut.

17.     Quill employs a variety of fraudulent and unlawful strategies to maximize the amount of contingency fees it can recover and the amount of attorney's fees it can charge Ford and other automobile manufacturers.  These include, but are not limited to, the following:

COMPLAINT

- Quill obtains thousands of clients each year through deceptive advertising and promises that it will zealously advance its clients' interests by obtaining for its clients a speedy recovery on their Lemon Law claims against Automakers while, in fact, Quill's principal goal is first to avoid a pre-suit resolution and speedy buyback and then to file suit and delay resolution to maximize its own recovery of fees and penalties regardless of its clients' best interests;

- Quill sends thousands of form letters each year to Ford and other Automakers under its clients' names that intentionally (but contrary to the policy of the Lemon Law) fail to explicitly request repurchase (to minimize the risk—*to Quill*—of a quick pre-suit resolution) and omit mention of Quill's involvement;

- Quill instructs thousands of clients each year to contact Ford's and other Automakers' call centers and read a script that explicitly avoids a request for the repurchase of their vehicle;

- Quill instructs thousands of clients each year to send follow-up emails that it drafts and that again fail to explicitly request repurchase;

- Quill instructs thousands of clients each year not to respond to emails from Ford and other Automakers requesting the additional information (*e.g.*, mileage and vehicle location) needed to complete the California Lemon Law repurchase form, even in those instances where Ford has agreed to repurchase the vehicle;

- Quill often files lawsuits without the client's consent or knowledge; and

- Quill uses non-legal personnel, including foreign contract workers and paralegals, to perform legal tasks and record time internally, but then bills that work to Ford as if the work had been performed by California-licensed Quill attorneys at California attorney hourly rates.

COMPLAINT

18.     These fraudulent and unlawful practices are designed to maximize the fees that Quill can earn at the expense of both its own clients, who were promised a speedy recovery, and Ford.  This is because if a client accepts Ford's offer to repurchase its vehicle before a suit is commenced, Quill has lost the opportunity to bill for hours actually worked—not to mention the real business model, which is to bill as California attorney time legal work performed by Quill non-lawyers and overseas VAs earning as little as $13/hour.

**The "Front-End" Scheme**

19.     Quill's scheme begins at client intake.  Quill recruits vehicle owners through social media, mass mailings, and advertising that promises speedy resolution of their warranty claims.  In truth, Quill has no intention of seeking a speedy resolution.  A prompt pre-litigation repurchase—which is what the Lemon Law is designed to achieve—would deprive Quill of the opportunity to bill fraudulent and unlawful attorney's fees.  Quill's business model requires litigation, and preferably prolonged litigation.

20.     When an owner of a Ford vehicle reaches out to Quill for assistance, the client is connected not with a licensed attorney, but with a non-lawyer "Coaching Specialist."  Although an owner of a supposedly problematic vehicle can always reach out to Ford directly to seek a repurchase, as every warranty booklet advises, the Quill Coaching Specialist will steer the new client away from this easy and efficient remedy and instead guide the client towards triggering a Lemon Law action that can be brought in court.  Quill's objective is to develop a story that Quill can later claim proves that Ford willfully failed to act upon a repurchase request so as to create exposure for civil penalties.  Quill falsely promises these clients that they will be better compensated if Quill handles the matter on their behalf, while failing to inform them of other options to obtain speedy compensation.  Quill also fails to explain that the time required to process the repurchase will be much longer (to allow Quill to generate more fake fees) and that the benefits of the delay—and of the Lemon Law's fee-shifting provision—flow only to

8

COMPLAINT

the lawyers.  To the extent Quill's clients are making any decisions at all in their own cases—and the standard Quill contingency agreement indicates the clients are backseat passengers in the Quill-driven vehicle—they are doing so in a vacuum, uninformed that, at the end of the day, they will have to stay in the alleged lemon for much longer and will generally pocket *less* than if they had accepted an early repurchase offer.  Quill's clients are also not informed that they may be taxed on the full amount of such awards, including fees paid directly by Ford to their lawyers, as such amounts are properly included as gross income to the consumer for federal 1099 and California income tax purposes.

21.    In most cases, the Coaching Specialist first creates a form letter to Ford— nearly identical for the majority of the thousands of new Quill clients each year— designed to create a record of putting Ford on notice of the client's defective vehicle.  However, the Quill Coaching Specialist purposefully omits two crucial elements from this letter.  First, the letter specifically omits a repurchase request, instead vaguely expressing the car owner's "deep dissatisfaction" with their vehicle.  After sending this letter, the Quill Coaching Specialist instructs the client to cease all contact with Ford, including when Ford responds with offers of assistance, repair, or repurchase.

22.    In other cases, Quill instructs its client to call Ford and read a script that explicitly avoids a request for the repurchase of their vehicle.  The client then follows up with a Quill-drafted email that also purposely avoids an explicit request for a repurchase.  Again, Quill then instructs the client to cut off all contact with Ford and not to respond to any offer of assistance, repair, or repurchase.

23.    Quill's malfeasance towards its own clients (all in service of defrauding Ford and other Automakers for Quill's benefit) does not stop there.  Often, Quill will file a lawsuit without even asking or informing the client on whose behalf they are purportedly suing.  Some Quill clients have admitted to Ford that they were surprised to learn that they were a plaintiff in a lawsuit.

COMPLAINT

24.     This fraudulent and unlawful scheme is perpetrated at a time when the consumer clients are not even seriously contemplating litigation.  Rather, misled by Quill's deceptive advertising, they are contemplating the speedy resolution, by repurchase or otherwise, that Quill promised them.  The consumer driving an alleged lemon has a simple goal—get out of the vehicle quickly and cost-free through the Lemon Law.  It is only Quill, in service of its own greed, that knows the goal of protracted and costly litigation—a goal that it affirmatively conceals from its own clients.

**The "Back-End" Scheme**

25.     The foregoing is only step one of Quill's fraud, and is designed to set up and allow Quill to reap tens of millions of dollars from step two: systematic billing fraud in which Quill charges Ford and other Automakers California attorney rates for tasks that were not performed by attorneys and were instead performed by non-lawyers, including VAs and others who lack the necessary qualifications to perform legal work in the State of California.  In fact, the huge number of cases filed by Quill and the relatively small number of licensed California lawyers that it employs make it mathematically impossible for licensed attorneys to perform the work that Quill seeks to bill as attorney time.

26.     Ford has identified certain work descriptions commonly included on Quill billing statements that are in fact routinely performed by non-lawyers but falsely attributed to Quill partners and associates.  These include such basic litigation tasks as preparing boilerplate complaints (thousands filed each year), initial discovery requests (thousands served each year), and responses to standard discovery requests and motions (thousands served and filed each year).  This work is falsely attributed in Quill's billing records to Quill attorneys, who command significantly higher billing rates than non-lawyers.  Quill has thereby fraudulently and unlawfully obtained from Ford more than $25 million in legal fees to which it was not entitled.  Those proceeds have never been

returned to Ford and remain concealed from Ford, despite Ford's demand for their return.

27.    Kevin Jacobson, Quill's Co-Founding Partner, has a close relationship with Hamid Kohanfars, the principal of LegalSoft, Inc. a/k/a Virtual Staff Inc. ("LegalSoft"), a California corporation that, according to its website, provides law firms with "high-caliber virtual legal staff across all practice areas."  The website depicts lawyers and legal assistants from numerous countries including Brazil, Argentina, Colombia, and the Philippines.  Jacobson has publicly advertised his use of LegalSoft to grow his legal practice and has described Kohanfars as the equivalent of a personal trainer for his law practice.  LegalSoft provides Quill with foreign contract workers (referred to by LegalSoft as "Virtual Assistants" or "VAs" and sometimes referred to by Quill as "bots") who perform a variety of work tasks on Quill's Lemon Law cases.  But instead of listing the VAs or "bots" as the timekeepers for the work they perform, Quill falsely identifies this work in fee applications and fee statements as being performed by Quill lawyers located in California, thus enabling Quill to bill the hours at many multiples of the actual rates paid to the foreign VAs.

28.    Tasks performed by VAs and Quill's paralegals and other non-attorney staff that are fraudulently and unlawfully passed off in Quill timesheets as being performed by attorneys include, but are not limited to: drafting complaints; drafting discovery documents such as initial disclosures, discovery requests, and responses to deposition notices; reviewing documents and preparing files for document production; drafting routine court filings including routine motions; and handling email service.  In addition, virtually all client communications are handled by VAs.

29.    Upon information and belief, generally the first time a Quill client speaks with an actual Quill attorney is when they are prepared for a deposition to be taken by the Automaker defendant.  Prior to deposition preparation (including in their initial communications seeking to retain Quill for their case), Quill clients speak only to "case managers," who are actually VAs.

30. Yet Quill bills these "communications with client" as attorney time in timesheets submitted to Ford and to courts. Indeed, the first entry in a Quill timesheet routinely attributes to Jacobson an "Initial Communication with client regarding case"—at hourly rates ranging from $395 to $500—even though this communication was in fact *in every case* conducted by a non-attorney sitting in Quill's Los Angeles office or somewhere overseas. In stark contrast to the attorney rates it charges Ford for tasks performed by non-attorney VAs, Quill pays LegalSoft a monthly fee for use of its VAs that, according to LegalSoft's website, begins at approximately $13 an hour.

31. In addition to using VAs, Quill employs numerous paralegals and legal assistants in California who perform a variety of billable tasks, including many of the same tasks performed by VAs (*e.g.*, communicating with clients, preparing complaints and other pleadings, preparing discovery requests, preparing responses to discovery requests, preparing standard motions, and preparing court status reports). Documents prepared by paralegals and legal assistants are generally filed and served without any attorney review. However, instead of attributing these tasks to legal assistants on its billing statements, which would cause them to be billed at a fraction of attorney rates, Quill falsely attributes this work to Quill attorneys.

32. Although all Quill paralegals, legal assistants, and VAs are required to track their time in Quill's billing software, when preparing fee applications, Quill's billing department takes the time entered by non-lawyers into the billing system and reallocates it to one of the Quill attorneys assigned to handle cases against the relevant Automaker. The billing department also standardizes the task descriptions. As a result, Quill's time records implausibly include thousands of identical or virtually identical descriptions, including the amount of time attributed to the task, across numerous cases, numerous timekeepers, and lengthy time periods.

33. Fee applications submitted by Quill falsely represent that it is the custom and practice of attorneys at Quill to contemporaneously track their time during litigation and enter it into the firm's billing software in tenth-of-an-hour increments. The

applications further falsely represent that the attachments to the fee applications constitute true and correct copies of the firm's computerized billing records. The supporting declarations, executed by Jacobson, falsely represent that he has carefully reviewed and audited the billing records. These applications, based on intentional misrepresentations, are shams that deprive the fee applications of any legitimacy.

34. Unbeknownst to Ford or the courts, Quill thus exploited the Lemon Law by creating fake time records in thousands of warranty claim cases that they demanded Ford and other Automakers pay after resolution of a consumer's underlying claims, seeking millions of dollars in compensation for work that was never performed by the attorneys identified in Quill's billing records. Quill's fee petitions were not based on "actual time expended" in each case, as required by California law. Quill also leveraged these fake time records to make fraudulent and unlawful demands for payment from Ford and to extract settlements that were based on material fraudulent representations.

35. Quill participated in the fraudulent and unlawful billing scheme knowingly and with the intent to deceive and defraud Ford for Quill's benefit. In doing so, Quill knowingly and intentionally made misrepresentations—in extra-judicial communications as well as in sworn, perjurious declarations—to Ford and to numerous courts about its fictitious billing records. When these misrepresentations were made in court, through the submission of sham records about the legal work performed, they impeded the administration of justice, stripping the statutory fee recovery procedure of its legitimacy. Quill intentionally concealed from Ford and the courts that it sought fictitious fees based on false billing records stemming from its fraudulent and unlawful billing practices. Quill's intentional misrepresentations and fraud resulted in unwarranted fee payments that harmed Ford's business and property interests.

36. Quill's billing fraud went to the central issue of the fee petition proceedings—how much Ford owed pursuant to the fee-shifting provision in California's Lemon Law—and affected the outcome of those proceedings.

37.     Quill's scheme relies on and takes advantage of the structure of Lemon Law litigation.   Fee petition proceedings are not part of the merits of the underlying lawsuit in which the alleged grievance of the plaintiff is redressed; instead, fee motions are not made or considered by the court until the substantive Lemon Law claim has been resolved either through settlement or trial, at which point the Lemon Law plaintiff's vehicle is repurchased, the plaintiff is otherwise compensated, and Quill takes its contingent percentage of the client's recovery.   Then, the case is typically dismissed with the court retaining ancillary jurisdiction only for post-settlement or post-trial issues, including a statutory entitlement to payment of attorney's fees based on actual time expended.   That distinct jurisdictional grant allows a court to consider attorney's fees even when the underlying case is resolved.   The fee proceeding is totally separate from the merits of the underlying Lemon Law litigation: the issue presented is different; the legal standard is different; the parties in interest are different; and the evidence is different.   Nor do fee proceedings affect the finality of the merits ruling or settlement.

38.     As applicable to this case, many months—sometimes as much as a year or more—after the merits of Lemon Law cases were finalized and the plaintiffs' grievances redressed, Quill would make a demand for fees to Ford, pursuing only its own interests (as its consumer clients receive none of those fees).   In some cases, Ford would settle the fee claims based on Quill's fraudulent and unlawful demands, meaning there was no court action on those demands.   Quill's fraudulent and unlawful demands were material to Ford's settlement decisions.   If Ford refused to pay, then Quill would file a fee motion, starting a new proceeding before the court claiming statutory entitlement to fees.   Because discovery had long been closed, Ford would be unable to obtain discovery regarding the bases for the fee application.   Quill would then charge Ford for its time associated with the fee hearing—often spanning multiple days of (alleged) attorney labor to prepare and attend.

39.     Ford had no ability at the time of Quill's fraudulent and unlawful fee demands or the judicial proceedings that sometimes followed those demands to discover

14

COMPLAINT

the fraud or to suspect that Quill was engaging in wholesale fraud and fabrication of evidence by passing off work performed by foreign VAs and other non-lawyers as work performed by California lawyers and billed at California lawyer rates.  Accordingly, Ford had every reason to accede to Quill's demands.

40.	The fraudulent and entirely fabricated nature of Quill's timesheets is not limited to the passing off of non-lawyer VA and legal assistant time as attorney time. This became apparent after Ford publicly raised the issue of fraudulent practices by certain firms and took a firm position on requiring billing invoices from Quill for all cases earlier this year.

41.	On information and belief, immediately after Quill learned that Ford was focused on investigating and challenging these fraudulent practices, Quill instituted a new team dedicated to "scrubbing" its timesheets of implausible and temporally impossible time entries.  Team members were instructed to replace such entries with more conservative entries for time spent on particular tasks, which were pre-prepared by Quill for timekeepers to select from.  Quill instituted these changes to make it easier for its billing department to convert non-attorney time into purported attorney time while avoiding facially suspect temporal impossibilities.  As a result, Ford noticed that Quill immediately began reducing the amount of time it billed for certain tasks in a way that could not be accounted for based on real-world activities by real timekeepers.

42.	For example, in a fee application filed by Quill on July 7, 2025 in *Camacho v. Ford Motor Co.* San Diego Co. Superior Court Case No. 37-2023-00009725-CU-BC-CTL, supported by a declaration of Quill's Co-Founding Partner, Kevin Jacobson, Quill reduced approximately 25 time entries of certain of its associates for tasks related to the drafting of discovery requests and motions in limine.  *See* Exhibit A.  As a result of the reductions, the amounts billed for drafting the complaint and the initial discovery requests were reduced to either 0.10 or 0.20 hours, and the amount billed for each of 20 motions in limine all prepared on the same day was 0.30 hours.

43.     This contrasts sharply with the amount Quill typically billed for similar tasks immediately before Quill learned of Ford's focus on fraudulent practices.  As an example, in a fee application filed on November 12, 2024 in *Reynaga v. Ford Motor Co.* Los Angeles Co. Superior Court Case No. 22STCV15694, also supported by a declaration of Jacobson, the amount billed for drafting the complaint and initial discovery requests averaged almost 1 hour each, and the time billed for preparing 10 motions in limine totaled 8.3 hours.  *See* Exhibit B.  Assuming that the amounts of lawyer time properly attributable to these tasks are the amounts set out in the *Camacho* application, the fees sought in *Reynaga* are overstated by not less than $4,420.00, or (based on these limited tasks alone) approximately 8.1% of the total of $54,459.50 in lodestar fees sought in *Reynaga.  See* Exhibit C.

44.     Another example is a fee application filed on November 30, 2023 in *Frazier v. Ford Motor Company,* Case No. 5:22-cv-00464-JGB-SP (C.D. Cal.), also supported by a declaration of Jacobson.  Again assuming that the amounts set out in the *Camacho* application reflect the proper amount of attorney time attributable to these tasks, the time billed for certain tasks is similarly overstated by a total of $1,215.00, or approximately 7.7% of the total $15,607.00 in lodestar fees sought.  *See* Exhibit D.

45.     Of course, the specific entries discussed in the *Camacho*, *Reynaga* and *Frazier* fee applications are not the only fraudulent and unlawful entries in those fee applications.  The *Camacho* fee application sought a total of $85,711.20 in fees and expenses with a base lodestar amount of $68,871.00.  It sought recovery for 153.30 hours of work, all of which is attributed to Quill's partners and associates with billing rates from $350.00 per hour to $950.00 per hour although a substantial portion of the work was actually performed by non-lawyers.  Jacobson's declaration submitted in support of the *Camacho* fee application falsely stated the following under penalty of perjury: "The custom and practice of the attorneys at Quill & Arrow, LLP is to contemporaneously track their time during litigation and enter it into the firm's billing software in increments of tenths-of-an-hour, as is typical in the industry, during the

16

COMPLAINT

normal course of business.  Attached hereto . . . is a true and correct copy of my firm's computerized billing records which I have carefully reviewed and audited."

46.     Similarly, the *Reynaga* fee application sought a total of $94,009.32 in fees and expenses with a base lodestar amount of $54,459.50.  It sought recovery for 134.60 hours of work, all of which is attributed to Quill's partners and associates with billing rates from $350.00 per hour to $525.00 per hour although a substantial portion of the work was actually performed by non-lawyers.  Jacobson's declaration submitted in support of the *Reynaga* Fee Application falsely stated the following under penalty of perjury: "The custom and practice of the attorneys at Quill & Arrow, LLP is to contemporaneously track their time during litigation and enter it into the firm's billing software in increments of tenths-of-an-hour, as is typical in the industry, during the normal course of business.  Attached hereto . . .  is a true and correct copy of my firm's computerized billing records which I have carefully reviewed and audited."

47.     As another example, the *Frazier* fee application sought a total of $22,459.57 in fees and expenses with a base lodestar amount of $15,607.00.  It sought recovery for 32.90 hours of work, all of which is attributed to Quill's partners and associates with billing rates from $350.00 per hour to $500.00 per hour although a substantial portion of the work was actually performed by non-lawyers.  Jacobson's declaration submitted in support of the *Reynaga* Fee Application falsely stated the following under penalty of perjury: "The custom and practice of the attorneys at Quill & Arrow, LLP is to contemporaneously track their time during litigation and enter it into the firm's billing software in increments of tenths-of-an-hour, as is typical in the industry, during the normal course of business.  Attached hereto ... is a true and correct copy of my firm's computerized billing records which I have carefully reviewed and audited."

**Ford's Damages**

48.    Since January 1, 2021, Ford has paid Quill more than $100 million, of which Ford estimates approximately 50% (or more than $50 million) constitutes payment for attorney's fees.  The annual totals of payments are as follows:

| 2021 TOTAL | $ 1,271,138.21 |
|---|---|
| 2022 TOTAL | $ 3,155,793.22 |
| 2023 TOTAL | $ 8,733,059.39 |
| 2024 TOTAL | $ 32,686,951.37 |
| 2025 TOTAL | $ 39,276,104.55 |
| 2026 through 4/30 | $ 16,099,622.20 |
| TOTAL | $ 101,222,668.94 |

49.    Based on its review of a sample of 169 fee applications that Quill has submitted to California courts, which request a total of $4,450,536 in attorney's fees, Ford reasonably estimates that, of this amount, not less than 50% has been billed to Ford as a direct and proximate result of Quill's fraudulent and unlawful billing practice of falsely representing that tasks performed by non-lawyers were performed by Quill's attorneys, resulting in an estimated total damages amount of not less than $25 million.

50.    Any uncertainty as to the amount of damages caused by Quill's fraudulent and unlawful billing scheme has been caused by Quill's actions, and the true extent of the resulting damages will only be revealed as Ford assembles additional evidence and through discovery in this matter.

51.    Because Quill's fee application process was predicated entirely on fraudulent and fabricated billing records, the entire fee petition process was tainted by that false evidence and by Jacobson's false representations to the courts that he had audited the billing records.  Quill failed to properly substantiate its claims for fees or to provide Ford and the courts with truthful evidence showing the actual individuals (and their respective rates) who performed work on Lemon Law cases.  The payments made

18

by Ford to settle fee demands or to comply with court determinations were therefore based on Quill's fabricated and untrue evidence and were tainted, unearned, and unwarranted. In short, Quill's systematic misrepresentations, corrupt and intentional obstruction and impeding of the due administration of justice, and fraud upon Ford and the courts deprived the underlying fee litigations of their legitimacy and rendered them as fraudulent shams. The scope and scale of Quill's fraud constitutes the type of conduct that deprives the fee proceedings of their legitimacy.

52.     Quill's conduct cannot reasonably be described as zealous advocacy or a legitimate exercise of Quill's (or its clients') First Amendment rights to petition the government. Instead, Quill sought to fraudulently and unlawfully induce payments directly from Ford and, if necessary, to unduly influence the courts through fraudulent conduct in proceedings that did not involve redress of the underlying Lemon Law grievance, but were separate and distinct proceedings that involved only a claim for payment. Indeed, Quill attorneys, despite being officers of the court, routinely corrupted the integrity of the judicial process by intentionally perpetrating a fraud on every court in which they appeared bearing their fraudulent and unlawful fee statements and perjured declarations. This massive fraud fully impaired the ability of each court to fairly adjudicate each individual fee motion before it and deprived those proceedings of their legitimacy.

## FIRST CAUSE OF ACTION

### (Cal. Pen. Code § 496)

53.     Ford realleges and incorporates by reference paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54.     California Penal Code Section 496(a) makes it a crime to receive or withhold from the rightful owner "property that has been . . . obtained in any manner constituting theft." Section 496(c) further provides that anyone injured by a violation of Section 496(a) may obtain treble damages and attorney fees in any civil action, regardless of whether a criminal conviction has been obtained.

19

COMPLAINT

55. As alleged herein, Ford held all the rights in its property consisting of the legal fees improperly obtained by Quill from Ford as a result of Quill's fraudulent and unlawful conduct.

56. Quill acted with the intent to deprive Ford of its property in a manner constituting theft under Section 496.

57. Quill received property that was stolen or otherwise obtained in a manner constituting theft, knowing the property was stolen or obtained through theft, and withheld the property from Ford knowing it was stolen or obtained through theft, in violation of Section 496(a).

58. On June 1, 2026, Ford demanded that Quill return the property that Quill unlawfully obtained from Ford. Quill refused to comply with Ford's demand and to date has not repaid Ford. Quill therefore remains in possession of Ford's property, to which Ford is rightfully entitled.

59. As a result of Quill's intentional wrongful conduct in violation of Section 496, Ford is entitled to monetary damages of three times the amount of money that Quill has wrongfully obtained from Ford, plus reasonable attorney's fees, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Unfair Competition, Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

60. Ford realleges and incorporates by reference paragraphs 1 through 59 of this Complaint as if fully set forth herein.

61. California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq*, ("UCL"), prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

62. The UCL "borrows" the provisions of other statutes, regulations, and common law rules, a violation of which can support a finding of an "unlawful" act subject to the remedies available under the UCL. Quill's business practices are unlawful in part because they involve deceit and collusion with intent to deceive

California courts and receive unearned attorney's fees from Ford and other Automakers, including by using unregistered foreign attorneys to practice law in California. Quill's actions constitute violations of, among other statutes, California Business and Professions Code §§ 6068, 6125, 6126, 6128 and 6400, California Civil Code §1770 (Consumers Legal Remedy Act), the California Rules of Professional Conduct (including, but not limited to, Rules 1.4 and 8.4), and California Penal Code §§ 118 and 496(a).

63. A business practice is "fraudulent" under the UCL if it is likely to deceive members of the public. Quill's business practices are fraudulent in part because its advertising is likely to deceive consumers, with the end result that harm comes to Automakers who make enormous payments to respond to consumers' claims that could and would have been resolved far more quickly and for far less had Quill been honest with those consumers. They are also fraudulent in part because the timesheets that Quill submits to Ford and/or to courts to support its requests for attorney's fees are laden with entries for tasks—billed at attorney rates—that its attorneys never worked.

64. Conduct is "unfair" within the meaning of the UCL if it (1) is "tethered to any underlying constitutional, statutory or regulatory provision"; (2) causes an injury that "outweighs 'the reasons, justifications and motives of the alleged wrongdoer'"; or (3) is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Quill's business practices are unfair because they violate numerous standards reflected in legal and ethical principles, are unjustified by any legitimate motive, and unethically injure consumers. Quill acts contrary to the best interest of its consumer clients by going to great lengths to avoid any resolution of its clients' claims short of litigation, including a vehicle repurchase, all to enable Quill to engage in protracted litigation in order to bill fraudulent time and to attempt to set up claims for civil penalties.

65. A party has standing to assert a UCL claim if the party can (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, *i.e.*,

21
COMPLAINT

economic injury, and (2) show that that economic injury was the result of, *i.e.*, caused by, the unfair business practice. Ford has lost money or property due to Quill's unlawful, fraudulent, and unfair business practices in several ways. For example, Quill interferes with Ford's ability to fulfill its obligations to its customers by instructing its clients to engage in misleading communications with Ford and to ignore Ford's efforts to satisfy warranty claims prior to litigation. Ford also suffers injury every time it is sued by Quill and is forced to incur legal fees in connection with unnecessary litigations, as well as to pay Quill's legal fees in connection with such litigations.

66.   As a direct and proximate result of Quill's violations of the UCL, Ford is incurring irreparable harm and is entitled to equitable relief including an injunction pursuant to section 17203: (1) preventing Quill from engaging in unlawful, fraudulent, and unfair business practices that harm both its clients and Ford, specifically, guiding its clients away from vehicle repurchases based on misrepresentations and unethical conduct; (2) requiring Quill to make truthful disclosures to its clients, in every case currently pending and going forward, about their ability to obtain an early vehicle repurchase and about the delays associated with litigation; (3) prohibiting Quill from filing any lawsuit without the client's knowledge and informed consent; and (4) requiring Quill to make truthful disclosures in every case currently pending and in future cases, including providing billing records that accurately attribute all work to the individual (whether attorney or non-attorney) who performed it.

67.   Ford is entitled to equitable relief because it has no adequate remedy at law to put an end to Quill's unfair practice of guiding its clients—based on misrepresentations—to eschew the resolution the Lemon Law was created for (a quick repurchase) in favor of a time-consuming and uncertain outcome in the form of litigation, all so Quill can further its fraud on Ford and the courts. Because of the overarching docket-wide nature of Quill's conduct, Quill has been able to resist legal challenges that are brought on a case-by-case basis in individual Lemon Law matters, as courts in those matters necessarily consider only the facts specific to each case. Absent

22

injunctive relief, Ford will continue to be forced to pay inflated restitutionary amounts based on manufactured claims, extra-compensatory civil penalties, and improper fee claims, as well as expend its own attorney's fees to defend against Quill's ongoing unlawful, fraudulent, and unfair business practices. Ford also has sustained and will continue to sustain incalculable reputational damage as a result of Quill's unlawful, fraudulent, and unfair business practices and public representations. At a time when consumer sentiment against American companies is at an all-time high—and hostility to "Big Auto" is particularly severe—Quill's actions cause ongoing harm that cannot be redressed through a mere damages award.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant awarding the following relief:

1. An award of actual damages in the amount to be determined at trial but believed to be not less than $25 million;

2. Treble damages;

3. Reasonable attorney's fees;

4. Pre-judgment interest according to statute;

5. Equitable relief, including restitution and injunctive relief; and

6. Any other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues and causes of action triable by jury.

Dated: June 18, 2026

KASOWITZ LLP

By: */s/ Daniel A. Saunders*

Daniel A. Saunders
Matthew S. Manacek

Edward E. McNally (*pro hac vice* application forthcoming)
Daniel J. Fetterman (*pro hac vice* application forthcoming)

*Attorneys for Plaintiff Ford Motor Company*

COMPLAINT

## EXHIBIT A

| Date | Description | Qty | Billable ($) |
|---|---|---|---|
| 03/08/2023 | Draft Plaintiff's Complaint, Civil Case Cover Sheet, and Summons. (REDUCED) | 0.10h | $35.00 |
| 04/26/2023 | Draft Plaintiff's Form Interrogatories to Defendant (REDUCED) | 0.20h | $70.00 |
| 04/26/2023 | Draft Plaintiff's Special Interrogatories to Defendant (REDUCED) | 0.20h | $70.00 |
| 04/26/2023 | Draft Declaration regarding Additional Special Interrogatories (REDUCED) | 0.20h | $70.00 |
| 04/26/2023 | Draft Plaintiff's Request for Admissions to Defendant (REDUCED) | 0.20h | $70.00 |
| 04/26/2023 | Draft Plaintiff's Request for Production of Documents to Defendant (REDUCED) | 0.20h | $70.00 |
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 1 Re Attorney Advertisement, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 2 Re Improper Referencing of Plaintiff's Counsel, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 3 Re Settlement Negotiations, including declaration and proposed order (REDUCED) | 0.30h | $165.00 |
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 4 Re Defendant's Affirmative Duties, including declaration and proposed order (REDUCED) | 0.30h | $165.00 |
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 5 Re Whether Defendant Fixed the Vehicle Within a Reasonable Number of Repair Attempts, including declaration and proposed order (REDUCED) | 0.30h | $165.00 |
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 6 Re Plaintiff's Financial Condition, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |

COMPLAINT

| Date | Description | Qty | Billable ($) |
|---|---|---|---|
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 7 Re Waiver of Implied Warranties, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 8 Re Defenses Not Asserted at Deposition, including declaration and proposed order (REDUCED) | 0.30h | $165.00 |
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 9 Re Continued Use of the Vehicle, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/24/2025 | Drafted Plaintiff's Motion in Limine No. 10 Re Multiple Repair Attempts, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 11 Re Abuse, neglect, or lack of maintenance, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 12 Re Attorney's Fees, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 13 Re Increased Costs of Vehicles, including declaration and proposed order (REDUCED) | 0.30h | $165.00 |
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 14 Re Ability to Repair Vehicles, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 15 Re Testimony Not Expressed in Deposition, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 16 Re Non-Designated Expert Opinion, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |

COMPLAINT

| Date | Description | Qty | Billable ($) |
|---|---|---|---|
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 17 Re Evidence Not Produced in Discovery, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 18 Re Non-Party witnesses not in Courtroom, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 19 Re Defendant's Proposed Arbitration, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |
| 03/25/2025 | Drafted Plaintiff's Motion in Limine No. 20 Re Mileage incurred post warranty or litigation, including declaration and proposed order. (REDUCED) | 0.30h | $165.00 |

27
COMPLAINT

**EXHIBIT B**

| Date | Description | Qty | Billable ($) |
|---|---|---|---|
| 05/11/2022 | Draft Complaint, Civil Case Cover Sheet, and Summons | 1.10h | $385.00 |
| 06/27/2022 | Draft Plaintiff's First Set of Request for Admissions to Defendant | 0.80h | $280.00 |
| 06/27/2022 | Draft Plaintiff's First Set of Request for Production of Documents to Defendant | 1.40h | $490.00 |
| 06/27/2022 | Draft Plaintiff's First Set of Form Interrogatories to Defendant | 0.30h | $105.00 |
| 06/27/2022 | Draft Plaintiff's First Set of Special Interrogatories to Defendant | 1.60h | $560.00 |
| 06/27/2022 | Draft Declaration of Counsel regarding Additional Special Interrogatories | 0.30h | $105.00 |
| 06/03/2024 | Draft Plaintiff's Motion in Limine No. 1, Exclude Testimony, Argument, or Implication that Plaintiff has made Insufficient efforts to request from Defendant Repurchase or Replacement of the Subject Vehicle. | 0.80h | $340.00 |
| 06/03/2024 | Draft Plaintiff's Motion in Limine No. 2, to Prohibit Testimony and Argument that Defendant Conformed the Vehicle within a Reasonable Number of Repair attempts because Defendant repaired a particular component. | 1.20h | $510.00 |
| 06/03/2024 | Draft Plaintiff's Motion in Limine No. 3, to Prohibit testimony or Evidence Regarding any claim of a disclaimer of the implied warranty of merchantability | 1.10h | $467.50 |
| 06/03/2024 | Draft Plaintiff's Motion in Limine No. 4, to Prohibit Defendant from asserting Defenses or Offering Testimony not Given at Deposition | 0.90h | $382.50 |
| 06/03/2024 | Draft Plaintiff's Motion in Limine No. 5, to Preclude argument by Defendant that Plaintiff's Continued Use of the Subject Vehicle Bars Recovery or Reduces Damages | 0.90h | $382.50 |

COMPLAINT

| Date | Description | Qty | Billable ($) |
|------|-------------|-----|--------------|
| 06/03/2024 | Draft Plaintiff's Motion in Limine No. 6, to Preclude Argument by Defendant that Defects or Components Repaired after a single Attempt are not counted under the Song-Beverly Act. | 0.80h | $340.00 |
| 06/03/2024 | Draft Plaintiff's Motion in Limine No. 7, to Exclude Evidence or Argument by Defendant as to Lack of Maintenance, Abuse, or Neglect | 0.90h | $382.50 |
| 06/04/2024 | Draft Plaintiff's Motion in Limine No. 8, to Prohibit Arguments Regarding Defendant's Ability to Repair Vehicle | 0.80h | $340.00 |
| 06/04/2024 | Draft Plaintiff's Motion in Limine No. 9, to Prohibit Testimony or Evidence Not Previously Identified or Contained within Defendant's Formal Discovery responses. | 0.90h | $382.50 |
| 06/04/2024 | Draft Plaintiff's Motion in Limine No. 10, To Exclude Evidence relating to Mileage on the Subject Vehicle Following Plaintiff's Repurchase Request. | 1.10h | $467.50 |

COMPLAINT

**EXHIBIT C**

| TASK | Time billed in *Camacho* | Time billed in *Reynaga* | Difference | Dollar impact of Difference |
|---|---|---|---|---|
| | | | | |
| Draft Plaintiff's Complaint, Civil Case Coversheet and Summons | 0.10 | 1.10 | 1.00 | $350.00 |
| Draft Plaintiff's Form Interrogatories to Defendant | 0.20 | 0.30 | 0.10 | $35.00 |
| Draft Plaintiff's Special Interrogatories to Defendant | 0.20 | 1.60 | 1.40 | $490.00 |
| Draft Declaration regarding Additional Special Interrogatories | 0.20 | 0.30 | 0.10 | $35.00 |
| Draft Plaintiff's Request for Admissions to Defendant | 0.20 | 0.80 | 0.60 | $210.00 |
| Draft Plaintiff's Request for Production of Documents to Defendant | 0.20 | 1.40 | 1.20 | $420.00 |
| Drafted Plaintiff's Motion in Limine No. 1. | 0.30[1] | 0.8 | 0.50 | $225.00 |
| Drafted Plaintiff's Motion in Limine No. 2 . | 0.30 | 1.20 | 0.90 | $405.00 |
| Drafted Plaintiff's Motion in Limine No. 3. | 0.30 | 1.10 | 0.80 | $360.00 |
| Drafted Plaintiff's Motion in Limine No. 4. | 0.30 | 0.90 | 0.60 | $270.00 |
| Drafted Plaintiff's Motion in Limine No. 5. | 0.30 | 0.90 | 0.60 | $270.00 |
| Drafted Plaintiff's Motion in Limine No. 6. | 0.30 | 0.80 | 0.50 | $225.00 |
| Drafted Plaintiff's Motion in Limine No. 7. | 0.30 | 0.90 | 0.60 | $270.00 |
| Drafted Plaintiff's Motion in Limine No. 8. | 0.30 | 0.80 | 0.50 | $225.00 |
| Drafted Plaintiff's Motion in | 0.30 | 0.90 | 0.60 | $270.00 |

[1] There are variances in the descriptions of the motions in limine between *Camacho* and *Reynaga*. However, in *Camacho*, the reduced billing amount for each motion in limine was 0.30 hours.

30

COMPLAINT

| | | | | |
|---|---|---|---|---|
| Limine No. 9. | | | | |
| Drafted Plaintiff's Motion in Limine No. 10. | 0.30 | 1.10 | 0.80 | $360.00 |
| **TOTAL INFLATED CLAIM** | | | | **$4,420.00** |

31

## EXHIBIT D

| Date | Description | Qty | Billable ($) |
|---|---|---|---|
| 01/05/2022 | Draft Complaint, Civil Case Cover Sheet, Certificate of Assignment, and Summons | 0.70h | $315.00 |
| 06/29/2022 | Draft Plaintiff's Interrogatories (Set One) | 0.70h | $245.00 |
| 06/29/2022 | Draft Plaintiff's Requests for Production of Documents (Set One) | 0.70h | $245.00 |
| 06/29/2022 | Draft Plaintiff's Requests for Production of Admissions (Set One) | 0.70h | $245.00 |
| 04/12/2023 | Draft and Prepare Plaintiff's Requests for Production of Documents, Set Two | 1.40h | $490.00 |

COMPLAINT

**EXHIBIT E**

| TASK | Time billed in *Camacho* | Time billed in *Frazier* | Difference | Dollar impact of Difference |
|---|---|---|---|---|
| | | | | |
| Draft Plaintiff's Complaint, Civil Case Coversheet and Summons | 0.10 | 0.70 | 0.60 | $270.00 |
| Draft Plaintiff's Form Interrogatories to Defendant | 0.20 | 0.70 | 0.50 | $175.00 |
| Draft Plaintiff's Request for Admissions to Defendant | 0.20 | 0.70 | 0.50 | $175.00 |
| Draft Plaintiff's Request for Production of Documents to Defendant | 0.20 | 0.70 | 0.50 | $175.00 |
| Draft and Prepare Plaintiff's Requests for Production of Documents, Set Two | 0.20 | 1.40 | 1.20 | $420.00 |
| **TOTAL INFLATED CLAIM** | | | | **$1,215.00** |

COMPLAINT